**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL MENDEZ,
          *Petitioner-Appellant,*

v.

MIKE KNOWLES,* Warden,
          *Respondent-Appellee.*

No. 06-15153

D.C. No.
CV-03-00022-WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, Distict Judge, Presiding

Argued and Submitted
April 14, 2008—San Francisco, California

Filed August 1, 2008

Before: Ronald M. Gould, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Gould

---

*We retain in the caption the name of the original custodian of Michael
Mendez, Warden Mike Knowles. Should the parties desire that the caption
reflect his current custodian, they may file a motion requesting such a
change, supported by documentation identifying the current custodian.

9809

## COUNSEL

Barry L. Morris, Hayward, California, for the petitioner-appellant.

Mark Howell, Assistant Attorney General for the state of California, San Francisco, California, for the respondent-appellee.

## OPINION

GOULD, Circuit Judge:

The state of California charged and tried Michael Mendez for the molestation of two minor boys, in violation of sections 288(a), (b)(1), and 647.6(c)(2) of the California Penal Code ("CPC"). Over Mendez's objection, the prosecution introduced evidence of two prior convictions: (1) in 1989, Mendez pleaded guilty to sexual battery of a five-year-old boy in violation of CPC § 243.4; and (2) in 1990, Mendez pleaded guilty to committing a lewd act on a seven-year-old boy in violation of CPC § 288(a). At the conclusion of Mendez's trial, the trial court instructed the jury that if it found by a preponderance of the evidence that Mendez had committed a prior sexual offense, it could infer that he was likely to com-

mit and did commit the crimes for which he was on trial. The jury convicted Mendez on all counts.

Before the district court, in a 28 U.S.C. § 2254 petition for writ of habeas corpus, Mendez argued that these instructions violated his rights to due process and to a jury trial because the jury could have found him guilty on evidence less certain than proof beyond a reasonable doubt. Mendez also argued, among other challenges to the jury verdict, that the trial court violated his right to due process by not holding a hearing on his competence to stand trial. The district court denied Mendez's petition, but certified for appeal his claim of instructional error. On appeal, Mendez raises the certified issue, and also reasserts that the trial court violated his due process right to a hearing on his competence. California state prison warden Mike Knowles argues that we should not reach the merits of Mendez's appeal because he filed his notice of appeal late, and the district court erred in excusing Mendez's late filing. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. We hold that the district court did not err in excusing Mendez's late filing of a notice of appeal, and we affirm the district court's denial of Mendez's habeas petition.

**I**

On September 14, 1998, the State of California filed a complaint against Mendez alleging violations of the California Penal Code for his alleged molestation of two boys, one nine years old and the other ten. On June 1, 1999, while jury selection was underway, the prosecution offered to enter into a plea agreement with Mendez in which it would recommend a prison term of twenty-five years to life if Mendez pleaded guilty to all charges. Mendez placed two prerequisites on his acceptance of the plea agreement offer: (1) videotaped confirmation that the ten-year-old victim had been informed of the sentence Mendez was to receive; and (2) official assurance that the ten-year-old victim's school records would be purged of any reference to having been molested. The trial court told

Mendez that it lacked the authority to order what Mendez had requested, and the prosecution advised Mendez that it would withdraw the offer unless he entered into the plea agreement during that court session. Defense counsel then stated, "[W]e're either in a situation where we're going to trial or we're in a situation that comes within [California] Penal Code Section 1368. . . . [H]e's not making sense." The trial court inquired about defense counsel's reference to CPC § 1368, which requires the court to order a hearing to determine a defendant's mental competence if the trial court forms a doubt as to the defendant's competence. Defense counsel said that a hearing was unnecessary at that time, but that he would "advise the Court at the earliest possible moment" if he believed Mendez fell within CPC § 1368.

On June 8, 1999, during jury selection but out of the presence of the jury, Mendez accused the prosecutor of calling him a "sex predator." Later during the same proceeding, defense counsel formally requested that the trial court suspend proceedings pursuant to CPC § 1368: "I have a doubt as to the competency of Mr. Mendez to rationally assist me in the defense of the case under 1368. And I would ask the Court to recess from the jury trial in order to investigate that problem. . . . I would simply say my observations at this point would suggest some degree of decompensation or exacerbation of the problem [identified and flagged for the Court a week earlier]." In response, the trial court stated that it would "suspend criminal proceedings pursuant to [California] Penal Code Section 1368" and that it would later "go further in terms of appointing the appropriate experts to examine Mr. Mendez." That afternoon, the trial court decided that "rather than suspending the proceedings at [that] time and ordering a hearing pursuant to that section and related sections," it would "appoint an expert in the matter to assist [it] in making that determination as to whether to suspend the proceedings and order a competency hearing." Defense counsel objected to the trial court's decision not to follow the CPC § 1368 procedure.

On June 11, 1999, the trial court received the expert's report. The expert determined that "Mendez may have some intellectual limits, but he is not incapacitated." The expert also concluded that Mendez appreciated the charges against him and the range and nature of the possible penalties against him, he understood the adversarial nature of legal proceedings, he had "the capacity to disclose pertinent facts to his attorney," he could relate to his attorney, he could "assist in planning a defense, . . . realistically challeng[e] the prosecution, . . . manifest appropriate courtroom behavior, and . . . testify relevantly if need be." Relying on the expert's report, the trial court concluded that it would not suspend the proceedings and would not order a CPC § 1368 hearing to ascertain Mendez's competence. Mendez's case then proceeded to trial.

At trial, the prosecution introduced evidence of Mendez's two prior convictions upon guilty pleas: (1) a 1989 conviction for sexual battery of a five-year-old boy in violation of CPC § 243.4, and (2) a 1990 conviction for committing a lewd act on a seven-year-old boy in violation of CPC § 288(a). At the conclusion of the trial, the trial court gave the jury the following oral and written instructions, including California Jury Instructions—Criminal ("CALJIC") 2.50.01 and 2.50.1 (6th ed. 1996):

> [*CALJIC 1.01*:]
>
> Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others. . . .
>
> [*CALJIC 2.50.01*:]
>
> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

This evidence, if believed, may be considered by you for the . . . limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged.

For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in this case.

"Sexual offense" means a crime under the laws of a state or of the United States that involves . . . any conduct made criminal by Penal Code Section 288(a) and 243 point 4.

If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type of sexual offense. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.

Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

[*CALJIC 2.50.1*:]

Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed crimes or sexual offenses other than those for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other crimes or sexual offenses. . . .

[*Additional Beyond A Reasonable Doubt Instructions*:]

In deciding whether or not to testify, the defendant may choose to rely . . . upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. . . .

A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction of the truth of the charge. . . .

In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act or acts constituting that crime within the period alleged. . . .

If you find the defendant guilty of one or more of the crimes charged or included in the crime charged in the information, you must determine whether the allegation of the prior conviction for a violation of

Penal Code section 288 sub A on or about March 20th, 1990, is true. The People have the burden of proving the truth of the allegation. That also must be proved to the standard of beyond a reasonable doubt. If you have a reasonable doubt that it is true, you must find it to be not true.

On June 23, 1999, the jury convicted Mendez as charged. On September 13, 1999, he was sentenced to a prison term of 167 years to life. Mendez filed a notice of appeal on September 15, 1999, and his conviction was affirmed by the California Court of Appeal on June 22, 2001. On October 10, 2001, the California Supreme Court denied Mendez's petition for review.

On January 3, 2003, Mendez filed a petition for writ of habeas corpus in the United States District Court for the Northern District of California. On December 16, 2005, the district court denied Mendez's petition. On January 18, 2006, Mendez filed an untimely notice of appeal. The district court determined that the late filing of the notice of appeal was "excusable neglect" and deemed the notice of appeal effective. The district court certified for appeal Mendez's claim of instructional error. Mendez's appellate opening brief in this court addresses the certified issue of instructional error and the uncertified issue of whether the trial court violated Mendez's due process rights by not holding a hearing to ascertain his competence to stand trial.

## II

As a preliminary issue, California state prison warden Mike Knowles ("the Warden") argues that Mendez's appeal is foreclosed because he filed an untimely notice of appeal that should not have been excused by the district court. We disagree.

We review for abuse of discretion a district court's decision to grant a motion for an extension of time to file a notice of

appeal. *Pincay v. Andrews*, 389 F.3d 853, 858 (9th Cir. 2004) (en banc). We affirm a district court's grant of a motion for an extension of time "unless we are left with the definite and firm conviction that the lower court committed a clear error of judgment in the conclusion it reached after weighing the relevant factors." *Id.*

An appeal "from a district court to a court of appeals may be taken only by filing a notice of appeal with the district clerk." Fed. R. App. P. 3(a)(1). The notice of appeal "must be filed with the district clerk within 30 days after the judgment or order appealed from is entered." Fed. R. App. P. 4(a)(1)(A). The district court entered judgment denying Mendez's petition for writ of habeas corpus on December 16, 2005. The thirtieth and final day for Mendez to file a timely notice of appeal fell on Sunday, January 15, 2006. The next day, Monday, January 16, 2006, was Martin Luther King, Jr.'s Birthday, a national and legal holiday, and the court was closed. Therefore, the final day for Mendez to file the notice of appeal was Tuesday, January 17, 2006. *See* Fed. R. App. P. 26(a)(3) ("Include the last day of the period unless it is a Saturday, Sunday, [or] legal holiday . . . ."); Fed. R. App. P. 26(a)(4) ("As used in this rule, 'legal holiday' means . . . Martin Luther King, Jr.'s Birthday . . . .").

Mendez's counsel placed the notice of appeal, addressed to the district court, in a mailbox at 4:15 p.m. on Friday, January 13, 2006. On Saturday, January 14, 2006, he mailed another copy to the district court. On Tuesday, January 17, 2006, Mendez's counsel telephoned the district court clerk's office at 1 p.m., and learned that the clerk's office had not received the notice of appeal. At 4:02 p.m. that same day, he called again, but because the clerk's office was closed, he was unable to inquire about the notice of appeal. Mendez's notice of appeal arrived at the clerk's office one day late, on Wednesday, January 18, 2006. On January 30, 2006, Mendez moved for an extension of time pursuant to Rule 4(a)(5)(A) of the Federal Rules of Appellate Procedure, which permits a

party to so move no later than thirty days after the expiration of the deadline for filing a notice of appeal and permits the district court to extend the time for filing if the party so moving shows excusable neglect or good cause. Fed. R. App. P. 4(a)(5)(A). On February 8, 2006, the district court found excusable neglect and granted Mendez permission to file a late notice of appeal.

[1] The Warden contends that the district court abused its discretion when it concluded that Mendez's untimely filing of a notice of appeal was excusable neglect.[1] In evaluating whether neglect is excusable, a district court must consider the four factors established by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380 (1993): "(1) the danger of prejudice to the non-moving party, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the moving party's conduct was in good faith." *Pincay*, 389 F.3d at 855 (citing *Pioneer*, 507 U.S. at 395).

Here, the district court found that three of the four *Pioneer* factors weighed in favor of granting Mendez's motion: "Respondent concedes that it will not suffer prejudice if the extension is granted. He also admits that petitioner acted in good faith. The delay was only one day—practically the shortest delay possible. It had no impact on judicial proceedings beyond the instant motion." In focusing on the only factor at issue—the reason for the delay—the district court determined that the reason for the late filing was that Mendez's counsel

---

[1]Mendez did not claim that there was good cause for the late filing, and the advisory committee notes make clear that the "good cause" standard is only applicable to motions for extension of time filed within the initial thirty-day period for filing a notice of appeal. Fed. R. App. P. 4(a)(5) Advisory Committee's Notes to 1979 Amendment. Therefore, the only contested issue is whether the neglect of Mendez's counsel was excusable.

relied on the Postal Service to deliver the notice of appeal crosstown on the second day after its deposit in a mailbox. Even though the district court found that a late filing was foreseeable because the Postal Service advises its customers that first-class mail takes one to three days for delivery and that Mendez's counsel previously had not been diligent in filing papers in this case, it nevertheless concluded that this neglect was excusable.

**[2]** The Warden presents several arguments to support his contention that the district court abused its discretion in granting Mendez an extension of time for filing his notice of appeal. First, the Warden contends that because the delay was not caused by circumstances beyond Mendez's control, it should not be excused. But the Supreme Court in *Pioneer* rejected this rigid rule for excusable neglect, applying a broader standard that permitted a finding of excusable neglect even where the filer was in control of the situation that caused the delay. 507 U.S. at 386-95 (" '[E]xcusable neglect' . . . is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer."). In our en banc decision in *Pincay*, we applied this broader standard and affirmed the district court's decision to grant an extension after finding excusable neglect where a paralegal miscalculated the filing deadline—a situation in the control of the filer. 389 F.3d at 856-60 (explaining that a situation not in control of the filer is when the messenger delivering the documents to the clerk's office is hit by a truck). We thus reject the Warden's contention that Mendez's neglect cannot be excused because it was caused by circumstances within Mendez's control.

The Warden next argues that the most important *Pioneer* factor is the third—the reason for delay—and that the district court did not give this factor sufficient weight. But in *Pincay* we declined to give primary weight to any one of the *Pioneer* factors, concluding that "the weighing of *Pioneer*'s equitable factors" must be left "to the discretion of the district court in

every case." 389 F.3d at 860. Here, following *Pincay*, the district court appropriately weighed the factors to determine that the neglect of Mendez's counsel was excusable.[2]

The Warden also asserts that the district court applied an erroneous standard that requires a late filing to be inevitable for it to be considered inexcusable neglect. However, the record reveals that the district court did not adopt a standard of inevitability. The district court, while undertaking an analysis based on the *Pioneer* factors, stated a fact—that it was possible for the notice of appeal to arrive on time given the day Mendez's counsel placed it in the mailbox. This was not the recital of a standard, but rather was the mention of one fact of many the district court weighed pursuant to *Pioneer* to conclude that the untimely filing was the result of excusable neglect.

Finally, the Warden urges us to conclude that the district court committed a "clear error in judgment" by granting Mendez's motion for an extension of time despite the egregious behavior of Mendez's counsel. The Warden stresses that throughout the case Mendez's counsel repeatedly missed filing deadlines, and, despite knowledge that the district court clerk's office had not received the notice of appeal as of 1 p.m. on the day it was due, he took no action to ensure its timely delivery. The Warden relies on decisions of the Fourth and Seventh Circuits to support his contention that these actions amount to inexcusable neglect.[3] *See Thompson v. E.I.*

---

[2]The Warden asserts that the district court also erred by considering the prejudice to Mendez if the district court denied his motion to extend the time for filing. While prejudice to the party seeking an extension is not one of the *Pioneer* factors, it is clear from *Pincay* that a district court is not limited in its analysis of a motion for extension of time to those four factors. 389 F.3d at 859 (explaining that a district court can consider "the likelihood of injustice if the appeal was not allowed").

[3]The Warden also relies on *Kyle v. Campbell Soup Co.*, 28 F.3d 928 (9th Cir. 1994), a case decided before our en banc decision in *Pincay*. In

*DuPont de Nemours & Co., Inc.*, 76 F.3d 530 (4th Cir. 1996); *Prizevoits v. Indiana Bell Telephone Co.*, 76 F.3d 132 (7th Cir. 1996). In *Prizevoits*, the counsel for the party seeking an extension of time believed that he could not proceed with filing a notice of appeal until after the district court denied another pending motion. 76 F.3d at 133. The Seventh Circuit determined that the district court had abused its discretion in granting an extension of time to file the notice of appeal, concluding that excusable neglect "refers to the missing of a deadline as a result of such things as misrepresentations by judicial officers, lost mail, and plausible misinterpretations of ambiguous rules," that the rules misinterpreted by counsel were unambiguous, and that, as a result, his neglect was inexcusable. *Id.* at 134. In *Pincay*, we acknowledged the "differing conclusions" arrived at by other circuits, but elected not to adopt the narrow definition of excusable neglect created by the Seventh Circuit in *Prizevoits*. 389 F.3d at 857-60. Instead, we focused on the deference given to the district court's ability, with a more intimate knowledge of the case, to weigh the *Pioneer* factors and determine whether the untimely filing was a result of excusable neglect. *Id.* at 859-60.

**[3]** *Thompson* presents a situation factually similar to Mendez's untimely filing. *See* 76 F.3d at 532. There, the party seeking an extension of time allegedly placed the notice of appeal in the mail three days before the filing deadline, but the notice of appeal arrived three days late. *Id.* The Fourth Circuit affirmed the district court's decision to deny the motion for extension of time, concluding that "the neglect at issue in [that] case [was] nothing more than inexcusable run-of-the-mill inattentiveness by counsel." *Id.* at 535. The Fourth

---

*Kyle* we reversed the district court's finding of excusable neglect. 28 F.3d at 931. But the untimely filing in *Kyle*, unlike that in Mendez's case, involved an attorney's misinterpretation of unambiguous rules. *Id.* As a result, it does not provide us with relevant guidance as to whether the district court abused its discretion in this case.

Circuit determined that litigants, other than pro se prisoners, who decide "to rely on the vagaries of the mail must suffer the consequences if the notice of appeal fails to arrive within the applicable time period." *Id.* at 534. Unlike the Fourth Circuit, however, we have concluded that per se rules, finding specific actions inexcusable as a matter of law, "are not consistent with *Pioneer*." *Pincay*, 389 F.3d at 855. In other words, in this circuit, every time a party's counsel decides to "rely on the vagaries of the mail," that party is not necessarily foreclosed from seeking an extension of time to file a notice of appeal if the notice is untimely. *See id.* at 859-60 ("There should . . . be no rigid legal rule against late filings attributable to any particular type of negligence. Instead, we leave the weighing of *Pioneer*'s equitable factors to the discretion of the district court in every case."). Applying this deferential standard of review, we affirm the district court's grant of Mendez's motion for an extension of time, and conclude that we have jurisdiction to review the merits of Mendez's appeal.

## III

We review de novo the district court's denial of a habeas petition. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). Because Mendez is in custody pursuant to the judgment of a state court, because Mendez's claims were adjudicated on the merits by the Humboldt County Superior Court, and because Mendez filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we must deny the petition unless the state court's adjudication of Mendez's claims resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Although § 2254(d) mandates that only Supreme Court precedential holdings clearly establish a right, our circuit precedent may provide persuasive authority for

purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Because there was a reasoned state judgment rejecting Mendez's federal claims—the California Court of Appeal judgment—we "look through" the later unexplained order of the California Supreme Court rejecting Mendez's claims and analyze whether the reasoned state judgment was erroneous under the restrictive standard of § 2254(d). *See Ylst v. Nunnemaker*, 501 U.S. 797, 804-06 (1991).

## A

The issue certified by the district court for our review is whether the California trial court violated Mendez's rights to due process of law and trial by jury by instructing the jury that if the prosecution proved by a preponderance of the evidence that Mendez committed crimes or sexual offenses other than that for which he was on trial, the jury could infer that Mendez had the disposition to commit the same type of sexual offense and that he was likely to commit and did commit the crimes of which he was accused. Mendez argues on appeal that these instructions are unconstitutional under *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), because they permit the jury to convict Mendez of crimes on evidence less certain than proof beyond a reasonable doubt. The Warden counters that the district court correctly identified several differences between the facts of *Gibson* and those of Mendez's case that permit the same instructions to pass constitutional muster here. We agree with the district court and the Warden, and hold that these differences are sufficient to distinguish *Gibson* and establish a constitutionally-sound guilty verdict in this case.

**[4]** The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove every element of a criminal offense beyond a reasonable doubt. *Gibson*, 387 F.3d at 820 (citing *In re Winship*, 397 U.S. 358, 364 (1970)). "Any

jury instruction that 'reduce[s] the level of proof necessary for the Government to carry its burden . . . is plainly inconsistent with the constitutionally rooted presumption of innocence.' " *Id.* (quoting *Cool v. United States*, 409 U.S. 100, 104 (1972)). When a jury instruction is erroneous because it misdescribes the burden of proof, it "vitiates *all* the jury's findings," and no verdict within the meaning of the Sixth Amendment is rendered. *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). "Where such an error exists, it is considered structural and thus is not subject to harmless error review." *Gibson*, 387 F.3d at 820 (citing *Sullivan*, 508 U.S. at 280-82).

**[5]** Conversely, if the instructions in question are considered "ambiguous," then they will only violate due process if "a reasonable likelihood exists that the jury has applied the challenged instruction[s] in a manner that violates the Constitution." *Id.* at 820-21 (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)); *see also Mejia v. Garcia*, No. 06-16460, slip op. 9313, 9321-22 (9th Cir. July 25, 2008). All challenged instructions must be considered in light of all of the jury instructions and the trial record as a whole. *Id.* at 821 (citing *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).

The jury instructions at issue include CALJIC 2.50.01 and 2.50.1. The instructions given at Mendez's trial that incorporate CALJIC 2.50.01 provide:

> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

> This evidence, if believed, may be considered by you for the . . . limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged.

> For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in this case.

"Sexual offense" means a crime under the laws of a state or of the United States that involves . . . any conduct made criminal by Penal Code Section 288(a) and 243 point 4.

If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type of sexual offense. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.

Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

The instructions given at Mendez's trial that incorporate CALJIC 2.50.1 provide:

Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed crimes or sexual offenses other than those for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other crimes or sexual offenses. . . .

[6] In *Gibson*, we concluded that almost precisely the same combination of instructions were unconstitutional and

affirmed the district court's grant of habeas relief, explaining that "the interplay of [CALJIC 2.50.01 and 2.50.1] allowed the jury to find that Gibson committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the *charged* acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." *Id.* at 822. We determined that a jury conviction based on these instructions conflicted with the Supreme Court's maxim in *Winship* "that a defendant may not be convicted except 'upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *Id.* (quoting *Winship*, 397 U.S. at 364). We also determined, however, that standing alone CALJIC 2.50.01, which permitted the jury to infer that Gibson committed the charged crimes if it concluded that he had committed the prior sexual offenses, was constitutionally valid, and that had the jury not received CALJIC 2.50.1, which ascribed the lesser burden of proof to evidence of the previous sexual offenses, we "would have assumed that the jury followed, with respect to the prior sexual offenses evidence, the only standard regarding burden of proof they had received: reasonable doubt." *Id.* Thus, so far as our *Gibson* precedent is concerned, it was constitutionally valid for the jury to infer that Gibson committed the charged crime based on the previous, uncharged sexual offenses so long as those previous offenses were proven beyond a reasonable doubt. *Id.*

**[7]** The Warden distinguishes *Gibson* by arguing that, because the prosecution proved beyond a reasonable doubt that Mendez had been convicted of at least one of the prior sexual offenses, the jury could not have convicted Mendez of the charged offenses on anything less than proof beyond a reasonable doubt. We agree. Under *Gibson*, it was constitutionally valid for the jury to infer that Mendez committed the charged crimes based on the previous sexual offense because that previous offense was proven beyond a reasonable doubt. *Id.*

**[8]** In *Keating v. Hood*, 191 F.3d 1053 (9th Cir. 1999),[4] we recognized an exception to the principle established by the Supreme Court in *Sullivan* that where there is a structural error in how a case is submitted to the jury, which allows the jury to deliver a general verdict that potentially rested on different theories of guilt, at least one of which was constitutionally invalid, the conviction must be set aside. *Id.* at 1063. The limited exception to this principle is that "reversal may not be required if it is *absolutely certain* that the jury relied upon the legally correct theory to convict the defendant." *Id.* (internal quotation marks omitted). In *Lara v. Ryan*, 455 F.3d 1080 (9th Cir. 2006), we applied this standard of absolute certainty to conclude that where the jury was erroneously given an instruction that the petitioner could be convicted of attempted murder on either the proper theory of express malice or the improper theory of implied malice, the jury's specific finding that the defendant attempted to murder willfully, deliberately, and with premeditation "necessitate[d] the conclusion that it found [the defendant] guilty of attempted murder with express malice." *Id.* at 1087 ("[B]ecause the jury specifically found that Lara committed the murder attempts willfully, deliberately and with premeditation, it necessarily did not find that Lara committed the attempts recklessly," which is what would be required under an implied malice theory).

**[9]** Applying this "absolute certainty" test to Mendez's case, we are comfortable to an absolute certainty that the jury did not go astray, and specifically did not rely upon an incorrect burden of proof in convicting Mendez. Mendez's jury specifically found beyond a reasonable doubt that Mendez had been convicted of one of the two prior sexual offenses. Because the jury made this specific finding, it necessarily did

---

[4]In *Payton v. Woodford*, 346 F.3d 1204 (9th Cir. 2003), we overruled *Keating* only to the extent that it placed on the State the burden of demonstrating the significance of the error under the harmlessness standard. *Id.* at 1217 n.18; *see also Mancuso v. Olivarez*, 292 F.3d 939, 944 n.1 (9th Cir. 2002).

not find that Mendez committed the prior sexual offense by a preponderance of the evidence. *See Lara*, 455 F.3d at 1087.

Even if the jury had not made a specific finding of a prior conviction, the defendant's uncontested prior convictions allay the concerns articulated in *Gibson* that the defendant could have been convicted on proof less than beyond a reasonable doubt. 387 F.3d at 822 (concluding that had the jury not been instructed that it could find that the defendant had committed the prior bad act by a preponderance of the evidence, there would have been no constitutional violation). Here, Mendez's prior convictions for sexual offenses made the offending jury instruction not only unnecessary but also irrelevant, because Mendez's prior sexual misconduct had already been proven beyond a reasonable doubt. Indeed, in Mendez's case, his convictions were based upon guilty pleas which eliminated any uncertainty about whether he had committed the prior sexual offenses. As the fact of the prior convictions was not contested by Mendez, there was simply nothing left for the jury to find which could have been based upon or affected by a lesser "preponderance" standard.

Additional differences between Mendez's case and *Gibson* buttress our conclusion that the jury did not convict Mendez based on a constitutionally deficient burden of proof. First, in Mendez's case, several instructions regarding the beyond a reasonable doubt standard were read to the jury after the jury was given the preponderance of the evidence instruction; whereas in *Gibson*, once the preponderance of the evidence standard was read to the jury, the beyond a reasonable doubt standard was not included in any subsequent instructions. Second, the prosecutor in Mendez's case, unlike the prosecutor in *Gibson*, did not discuss, much less emphasize, the preponderance of the evidence standard in her closing argument. Third, the victim of Gibson's prior sexual offenses and the charged offense was the same, whereas Mendez's prior sexual offenses involved different victims than those involved in his charged offenses. We conclude that no rational juror would

have understood the instructions on evidence of prior sexual misconduct to relieve the jury of its duty to find beyond a reasonable doubt that Mendez had committed the charged offenses. We therefore uphold Mendez's convictions as constitutionally sound.

**B**

Mendez asks us to expand the Certificate of Appealability ("COA") to include his argument that the trial court improperly found him competent to stand trial without holding an evidentiary hearing. Although Mendez did not follow the procedure delineated in Rule 22-1(e) of the Ninth Circuit Rules for requesting the expansion of a COA—briefing certified issues under the heading, "*Certified Issues*," and briefing uncertified issues under the heading, "*Uncertified Issues*"—, he did request that we expand the COA.

**[10]** "The required showing for originally obtaining a COA on a claim remains the standard by which this court reviews the broadening of a COA. A habeas petitioner's assertion of a claim must make a substantial showing of the denial of a constitutional right." *Doe v. Woodford*, 508 F.3d 563, 567 (9th Cir. 2007) (per curiam) (quoting *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999) (internal quotation marks omitted)). To make this showing, Mendez "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (alteration in original, internal quotation marks omitted), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2).

The uncertified issue here involves Mendez's competence to stand trial. Mendez presents two grounds for the appeal of this issue. First, Mendez contends that under the Supreme Court's holdings in *Drope v. Missouri*, 420 U.S. 162 (1975), and *Pate v. Robinson*, 383 U.S. 375 (1966), Mendez presented

substantial evidence that an evidentiary hearing was required to determine whether he was competent to stand trial. Second, Mendez argues that he was deprived of a state-created liberty interest in an evidentiary hearing when the state did not follow the mandates of CPC § 1368 and provide him with an evidentiary hearing. The district court denied relief on this claim and also declined to certify the issue. Because, Mendez has failed to "make a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), we decline to expand the COA to consider the merits of the issue.

## 1

**[11]** Mendez contends that the trial court violated his due process right to a fair trial by not providing him with an evidentiary hearing to determine his competence. "[T]he failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope*, 420 U.S. at 172 (explaining the holding in *Pate*, 383 U.S. at 386). "The question to be asked by the reviewing court is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc). "[W]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the trial judge on his own motion must . . . conduct a hearing to determine competency to stand trial." *Torres v. Prunty*, 223 F.3d 1103, 1106-07 (9th Cir. 2000) (internal quotations marks omitted); *see also Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972) ("[A] due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial."). Factors to consider in ascertaining a defendant's competence include evidence of his irrational behavior, his demeanor at trial, and any prior medical opinion on competence. *See Drope*, 420 U.S. at 180. "The

state trial and appellate courts' findings that the evidence did not require a competency hearing under *Pate* are findings of fact to which [this court] must defer unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)." *Torres*, 223 F.3d at 1105.

Mendez contends that the evidence of his irrational behavior at trial and his counsel's request for an evidentiary hearing created a "bona fide doubt" as to his competence and required an evidentiary hearing. However, when compared with the evidence determined in *Drope* and *Pate* to require an evidentiary hearing, the evidence presented during Mendez's trial does not demonstrate that the California Court of Appeal was unreasonable in determining that there was no doubt as to Mendez's competence.

In *Pate*, the defense called four witnesses who testified to Robinson's long history of disturbed behavior. 383 U.S. at 378. One witness, Robinson's mother, testified that a brick dropped on his head when he was seven or eight years old. *Id.* The injury made him cross-eyed, gave him headaches, and resulted in noticeably erratic behavior. *Id.* at 378-79. A witness testified that on one occasion, Robinson, foaming at the mouth, "lost his mind," thinking someone was about to shoot him or come after him, and was hospitalized. *Id.* at 379. The medical records from his hospitalization indicated that he heard voices and saw things, and suggested the possibility that he was schizophrenic. *Id.* at 380. Other witnesses testified to the "daze" Robinson would be in from time to time. *Id.* at 380-81. Robinson had also previously shot and killed his son, and attempted to kill himself. *Id.* at 381. After serving nearly four years in prison for murdering his son, he was released and soon thereafter killed the woman for whose murder he was on trial. *Id.* at 381-82. When Robinson was arrested for the charged crime, he was unaware of his identity and denied knowing anything about the killing. *Id.* at 382. All four defense witnesses expressed the opinion that Robinson was insane. *Id.* at 383. The Supreme Court concluded that this evi-

dence entitled Robinson to a hearing on the issue of his competence to stand trial. *Id.* at 385.

In *Drope*, Drope's wife testified at trial that he had participated with four other men in forcibly raping her. 420 U.S. at 165-66. She also testified that she had resumed living with Drope after the incident on the advice of his psychiatrist. *Id.* at 166. She testified that she had initially told Drope's attorney that she believed Drope needed psychiatric care and related Drope's behavior of rolling down the stairs when he did not get his way. *Id.* She also testified that later, after talking with Drope's psychiatrist, she was not convinced that Drope was actually sick. *Id.* Later in the trial, Drope did not appear in court because he had shot himself in the abdomen earlier that morning. *Id.* at 166-67. The Supreme Court determined that this evidence created a sufficient doubt of Drope's competence and required further inquiry as to the question. *Id.* at 180.

In arguing that the district court should have held a hearing to determine his competence, Mendez puts great weight on the conditions he placed on his acceptance of the state's plea agreement offer: (1) videotaped confirmation that his ten-year old victim had been informed of the sentence Mendez was to receive; and (2) official assurance that the school records of that same victim would be purged of any reference to his molestation. He argues that these requests demonstrated irrational behavior that, when coupled with his counsel's doubt as to his competence, warranted an evidentiary hearing. *Drope* and *Pate* do not support this conclusion, and Mendez cites no clearly established Supreme Court precedent that holds that a defendant's rejection of a plea agreement, even if unwise, constitutes substantial evidence that he may have been incompetent. *See Davis v. Woodford*, 384 F.3d 628, 645 (9th Cir. 2004) (concluding that even though defendant was "recalcitrant and acted in ways that were detrimental to his case," the trial judge was not faced with substantial evidence of the defendant's incompetence). Nor do the reasons prof-

fered by Mendez for the rejection of the plea—the inability of the court and the prosecutor to accommodate his two requests —necessarily provide evidence of irrational behavior on the part of Mendez. As the California Court of Appeal determined, "[a] sex offender's fascination with his victim does not demonstrate that he is unable to understand the nature of the criminal proceedings or rationally to assist counsel in the conduct of a defense."

**[12]** As for the concern expressed by Mendez's counsel about Mendez's competence, in *Drope*, the Supreme Court determined that a lawyer's representations concerning the competence of his client should be considered, but emphasized that courts need not accept them without question. 420 U.S. at 177 n.13. Mendez's argument also omits from the "bona fide doubt" inquiry the finding of the court-appointed expert that Mendez was competent to stand trial. Evaluating Mendez's rejection of the plea agreement offer, his counsel's expressed concerns about his competence, and the court-appointed expert's conclusion that he was competent, we conclude that Mendez has not made a substantial showing that the trial court's decision not to hold an evidentiary hearing to determine Mendez's competence resulted in the denial of a constitutional right. *See Davis*, 384 F.3d at 645.

## 2

Mendez also argues that the trial court deprived him of his state-created liberty interest in an evidentiary hearing to determine his competence to stand trial. The procedure California established to determine when an evidentiary hearing is necessary to ascertain a defendant's competence is codified in CPC § 1368.[5] Mendez contends that because the trial court

---

[5]CPC § 1368:

   (a)  If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental compe-

initially said that it would order an evidentiary hearing under CPC § 1368 and then changed its mind and decided instead to appoint an expert to assist it in determining whether an evidentiary hearing under CPC § 1368 was warranted, Mendez was deprived of his liberty interest in a hearing to determine his competence. The California courts, however, have determined that the procedure followed by the trial court in Mendez's case—ordering a psychiatric examination—is required if there is a reasonable possibility that the defendant may be incompetent. *People v. Campbell*, 193 Cal. App. 3d 1653, 1663 (Cal. Ct. App. 1987) ("[I]f there is a reasonable possibility, even if it does not rise to the level of substantial

tence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.

(b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court.

(c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined.

If a jury has been impaneled and sworn to try the defendant, the jury shall be discharged only if it appears to the court that undue hardship to the jurors would result if the jury is retained on call.

If the defendant is declared mentally incompetent, the jury shall be discharged.

evidence, that the defendant is unable to understand the proceedings or assist in his defense, the trial court must order a psychiatric examination before deciding there is no need for a section 1368 hearing."). The state trial court followed the state-created procedure for ascertaining whether it had doubt as to Mendez's competence under CPC § 1368. We hold, therefore, that Mendez has not made a substantial showing that the trial court's decision not to hold an evidentiary hearing to determine Mendez's competence resulted in the violation of his due process rights, and decline to expand the Certificate of Appealability to consider the merits of this issue.

## IV

In conclusion, we reject the Warden's argument that the district court abused its discretion by granting Mendez's motion for an extension of time to file his notice of appeal. On the merits of Mendez's appeal, we uphold Mendez's conviction, concluding that it is absolutely certain that the jury found beyond a reasonable doubt that Mendez was guilty of the charged offenses and we decline to expand the Certificate of Appealability to consider Mendez's due process claim that the trial court was required to hold an evidentiary hearing to determine his competence.

   **AFFIRMED.**